UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

JEREMY E. PROPER,

              Plaintiff,

      -vs-

COMMISSIONER OF SOCIAL SECURITY,

              Defendant.

**DECISION AND ORDER**
**No. 1:12-cv-0098(MAT)**

---

## I.    Introduction

Jeremy E. Proper ("Plaintiff"), represented by counsel, commenced the instant action challenging the final decision of the Commissioner of the Social Security Administration ("the Commissioner") denying his application for disability insurance benefits ("DIB") under Title II of the Social Security Act ("the Act"). The Court has jurisdiction over this matter pursuant to 42 U.S.C. § 405(g).

## II.   Procedural History

On January 13, 2009, Plaintiff applied for DIB, claiming disability since January 17, 2008, based on, inter alia, multiple herniated discs and bulges in the thoracic and lumbar spine, hypertension, insomnia, Raynaud's phenomenon, supraspinatus tendinopathy, anxiety, and depression. T.250-52;[1] see also T.75, 86. After the application was denied, T.106-13, Plaintiff requested

---

[1]    Citations to "T." refer to pages in the certified copy of the administrative transcript, filed by the Commissioner in connection with her Answer to the Complaint.

an administrative hearing. On April 26, 2011, Plaintiff, along with his non-attorney representative, appeared at a hearing before administrative law judge David S. Pang ("ALJ Pang" or "the ALJ"). T.28-74. An impartial vocational expert testified at the hearing as well. On July 22, 2011, the ALJ issued a decision finding that Plaintiff was not disabled. T.83-96. Plaintiff sought review of the ALJ's decision before the Appeals Council, which denied review on December 9, 2011, making the ALJ's decision the final decision of the Commissioner. T.18-23. Plaintiff then filed his Complaint in this Court.

On May 2, 2012, the Court (Arcara, D.J.) referred the case to a magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(B). Defendant answered the Complaint on April 30, 2012, and, on July 31, 2012, filed a Motion for Judgment on the Pleadings (Dkt #10). On September 17, 2012, Plaintiff filed a Motion for Judgment on the Pleadings (Dkt #13). No further action occurred in the case until July 25, 2013, when Plaintiff filed a Motion to Remand to the Social Security Administration Pursuant To Sentence 6 of 42 U.S.C. § 405(g) (Dkt #18).

On April 16, 2014, Plaintiff filed a Motion for Writ of Mandamus and Interim Benefits (Dkt #23), which subsequently was stricken from the docket at Plaintiff's request (Dkt #24). On September 11, 2014, Plaintiff filed a Second Motion for Writ of Mandamus (Dkt #26), which the Commissioner opposed (Dkt #30). Plaintiff filed a reply on October 10, 2014 (Dkt #31) along with

additional exhibits (Dkt #32). However, on November 5, 2014, Plaintiff filed a Motion to Withdraw the Second Motion for Writ of Mandamus (Dkt #33). Plaintiff stated that he was withdrawing his motion for prompt decision and interim benefits filed on August 29, 2014" "because on or about October 10, 2014 he began receiving interim benefits" and "by notice dated October 29, 2014 Plaintiff's current claim was remanded to an Administrative Law Judge for further proceedings." Dkt #33, p. 1. Therefore, Plaintiff stated, he "has received substantially all of the relief he was seeking in this motion." Id.

On November 6, 2014, the Court (Arcara, D.J.) issued a text order (Dkt #34) granting Plaintiff's Motion To Withdraw the Second Motion for Writ of Mandamus and stated that "[i]n light of Plaintiff's statement that the claim was remanded to an Administrative Law Judge for further proceeding, Plaintiff is instructed to advise this Court as to what issues or motions, if any, remain pending . . . ." See Dkt #34. In response to Judge Arcara's text order, Plaintiff filed a Notice of Issues and Motions That Remain Pending (Dkt #35), stating that the cross-motions for judgment on the pleadings, and the motion for a sentence six remand remain pending.

The case was transferred to the undersigned on December 2, 2014 (Dk #36). After reviewing the record and the docket, the Court has determined that the remand proceeding referenced by Plaintiff does not cover the DIB claim at issue in the instant Complaint.

-3-

Rather, it covers the period commencing the day after ALJ Pang's adverse decision (July 23, 2011) through the present.  According to the documents submitted by Plaintiff as attachments to his motions for writs of mandamus, Plaintiff had a hearing before a new ALJ, Stanley Moskal, Jr. ("ALJ Moskal"), who found that he had numerous severe impairments as of the alleged onset date of July 23, 2011 (a mild disc bulge at L4-5 with subtle foraminal encroachment, and a mild disc bulge without stenosis at L5-Sl; small disc herniations at T4-5 and T6-7 effacing the thecal sac but without  stenosis or cord compression, mild bulges without stenosis at T7-8, T8-9 and T9-10; right supraspinatus tendinopathy and torn ante1ior glenoid labrum; a flap tear of the posterior horn of the left lateral meniscus, and a partial tear of the left cruciate ligament; bilateral carpal tunnel syndrome; and asthma). After reviewing the claim de novo, ALJ Moskal concluded that Plaintiff was not disabled prior to October 23, 2012, but that he became disabled on that date and has continued to be disabled through the date of his decision. The Commissioner sought review of ALJ Moskal's opinion by the Appeals Council, which found that substantial evidence did not support the disability finding. The Appeals Council accordingly remanded the matter for further administrative proceedings. Plaintiff has been receiving interim benefits for the time-period covered by ALJ Moskal's disability finding. In sum, it appears that Plaintiff's second DIB claim is still being litigated at the administrative level.

For the reasons discussed below, the Court finds that ALJ Pang's decision, regarding Plaintiff's first DIB claim, contains multiple errors of law that warrant remand for further administrative proceedings.

### III. Summary of the Administrative Transcript

#### A. Relevant Medical Evidence

Plaintiff presented to Dr. Alfredo Rodes at Southgate Medical Group on January 21, 2008, for his initial examination following a work-related injury on January 17, 2008. Plaintiff had picked up an approximately 80-pound garbage can with his right arm. This resulted in injuries to his back and right shoulder, as well as his left knee. T.545-46, T.628-29, T.503. On examination, straight leg raise testing resulted in low back pain complaints bilaterally, and left-sided leg and thigh pain. T.545. The right shoulder showed limited abduction and discomfort on extension. The left knee showed discomfort on full flexion and extension. Anterior and posterior drawer tests were negative in the left knee. Diagnoses were Neuritis or Radiculitis Thoracic or Lumbosacral Unspecified (724.4), with preexisting lumbar radiculopathy; Injury Shoulder & Upper Arm Other Unspecified (959.2); and Sprains & Strains/Knee & Leg Unspecified (844.9). T.629. Plaintiff was given a letter excusing him from work from January 18, 2008, to February 1, 2008. T.630.

Plaintiff was examined by Timothy V. McGrath, M.D., at the Hand and Shoulder Center of WNY on February 9, 2008, for complaints

of bilateral hand numbness and tingling. T.575-76; 626-27. Dr. McGrath diagnosed probable bilateral carpal tunnel syndrome, tenosynovitis of the flexor tendons at the wrist and hand, and mild medial and lateral epicondylitis. Dr. McGrath recommended nerve conduction studies to the bilateral extremities, including the median and ulnar nerves, to assess for peripheral compression disease. T.627.

On February 26, 2008, Plaintiff was examined by orthopedic specialist Dr. Deborah Bergfeld of the Buffalo Spine and Sports Institute. See T.503-05. Plaintiff presented with complaints of low back and left leg pain, as well as left knee pain and right shoulder/upper extremity pain. Plaintiff informed Dr. Bergfeld that he had experienced pain in all of these areas prior to the workplace injury, but that after January 17, 2008, the symptoms had become "100 percent worse." Upon physical examination, Plaintiff's gait was mildly antalgic on the left and his lumbar range of motion was limited in all planes by 50 percent. Plaintiff's cervical range of motion was unlimited in flexion but was limited in extension by 25 percent. Left shoulder range of motion was normal. He had decreased full abduction and forward flexion of the right shoulder, positive impingement signs in the right upper extremity, and AC horizontal compression testing. FABER testing and neural tension testing were positive in the left lower extremity, as well as slump-sit and straight leg raise. Spring testing was abnormal in the lumbar spine. Dr. Bergfeld diagnosed lumbar dysfunction with

lumbar facet degenerative changes at L4-5 and L5-S1 (based on an August 5, 2006 MRI), possible lumbar discogenic pain, left lower extremity radiculitis versus pseudo radiculitis, right shoulder impingement syndrome, right shoulder rotator cuff tendinopathy, and left knee pain with possible meniscal tear. T.504. She recommended continuing on Lortab, as needed, and doing a trial of diclofenac as an anti-inflammatory. Dr. Bergfeld also recommended obtaining further imaging studies and having Plaintiff commence physical therapy.

Dr. John H. Ring, Jr., an orthopedic surgeon, examined Plaintiff on April 15, 2008, for Worker's Compensation purposes. Dr. Ring noted that Plaintiff had a long history of difficulty with his low back since 1992 when he was working at Bell's Supermarkets and injured his low back. He recovered, but he had a recurrence at Sonwill Warehouse while he was unloading a truck, and was out of work for 1 month. Plaintiff had another recurrence in 2005 at Steuben Foods when he slipped while getting off a forklift, and was out for 5½ months. Most recently, he had the back re-injury on January 17, 2008. T.596-97. Straight leg raising was positive at 50 degrees on the right and at 30 degrees on the left, with pain in the low back. He had hypethesia to pinprick and light touch in the left foot. Dr. Ring's diagnosis was acute low back strain causally related to the January 17th injury and superimposed on a long history of recurrent episodes of back difficulty. T.597. According to Dr. Ring, Plaintiff's prognosis was "guarded" due to "many

episodes of back pain over the years." Id. Dr. Ring opined that Plaintiff could not return to his past job, but could return to what he characterized as "a sedentary job", provided that his lifting was restricted to less than 10 pounds and he was not required to do repetitive lifting. T.598.

Plaintiff's primary care physician, Dr. Rodes, saw Plaintiff on July 23, 2008. T.547-48. Plaintiff reported aching, sharp pain and stiffness in his lower back which radiated to his left thigh and leg, with associated numbness and tingling. Straight leg raising was positive bilaterally. The diagnosis was Neuritis or Radiculitis Thoracic or Lumbosacral Unspecified, chronic and stable. Plaintiff was to ice the affected area every evening, perform lumbar exercises as directed, and continue medications (Lortab, Soma, and Baclofen). Dr. Rodes assessed Plaintiff's disability status as "temporary mild to moderate partial disability." T.548.

On August 9, 2008, an MRI of the lumbar spine revealed no evidence of disc abnormality, no significant stenosis, and no central or neural foraminal stenosis. T.507. A right shoulder MRI done the same day revealed mild to moderate hypertrophic degenerative change at the acromioclavicular joint with mild to moderate imaging evidence of impingement; no evidence of rotator cuff tear; no evidence of Hill-Sachs abnormality or bony Bankart lesion; and no definite labral tear, although there might be some irregularity of the superior labrum. T.508.

Plaintiff was examined by orthopedic surgeon Dr. Cameron Huckell at Pinnacle Orthopedic & Spine Specialists on September 10, 2008, for Worker's Compensation purposes. T.614-17. Plaintiff complained of low lumbar pain which he rated as 5 out of 10 in intensity on average, and 8 out of 10 at its worst. The pain originated at the upper lumbar spine and radiated to the left hip and back of left thigh, across to the front of the knee. Plaintiff had numbness intermittently in the left foot with prolonged sitting. His left leg sometimes would give out, causing him to fall. Straight leg raising was positive in the supine position at 45 degrees. Plaintiff walked with a normal gait, without a cane, but was unable to stand on heels and toes. Paravertebral muscle spasm was noted. Functional range of motion was present in the shoulders, elbows, wrists, hips, knees, and ankles. Plaintiff had full muscle strength in the lower extremities. Plaintiff's mood and affect were normal. Dr. Huckell recommended a thoracic spine MRI to identify the potential source of Plaintiff's upper lumbar pain. He opined that Plaintiff was temporarily totally disabled. T.617.

An October 17, 2008, MRI of Plaintiff's lumbar spine showed a mild bulge with subtle foraminal encroachment without stenosis at the L4-5 level and another mild disc bulge without stenosis at the L5-S1 level. T.510. A thoracic spine MRI showed two small herniations of the nucleus pulposus without stenosis at the T4-T5 and T6-T7 levels and mild bulges without stenosis at the T7-T8, T8-T9, and T9-T10 levels. T.512-13.

-9-

On October 24, 2008, Plaintiff saw Dr. Rodes, reporting worsening pain that was uncontrolled with medication T.549-50, 612-13. The pain was aching and sharp with associated stiffness. Plaintiff walked with an antalgic gait but had full lower extremity strength. Straight leg raising was positive bilaterally.

An EMG/nerve conduction ("NCV") study dated November 7, 2008, showed no electrodiagnostic evidence of lumbar radiculopathy, peripheral nerve entrapment or neuropathy. T.609-11. On reviewing the report of the EMG/NCV study and the MRIs on November 14, 2008, Dr. Huckell  noted that there was "no significant pathology to explain [his] current symptoms", although the possibility of occult annular tears was not excluded. T.607. Dr. Huckell stated that Plaintiff "should be worked up for a possible left sided piriformis syndrome", a "neuromuscular disorder that occurs when the sciatic nerve is compressed or otherwise irritated by the piriformis muscle." T.607-08.

On December 9, 2008, orthopedic surgeon Walter D. Hoffman, M.D., examined Plaintiff and reviewed his diagnostic records for Worker's Compensation purposes. T.551-55; 564-68. Plaintiff complained of back and left leg pain. Dr. Hoffman noted that Plaintiff was "very incapacitated by this pain" and was unable to any lifting, pushing, or pulling. Plaintiff claimed he was unable to stand or sit for any length of time and had to change positions frequently or lie down often to rest his back. On examination, Plaintiff full range of motion in his neck with no muscle spasm,

and tenderness in his mid-dorsal and lumbar spine. Lumbar spine range of motion was 50% of normal. The EMG and nerve conduction studies were normal. Dr. Hoffman concluded that Plaintiff was "temporarily totally disabled and unfit to work even in a restricted capacity." T.553.

Also on December 9, 2008, Dr. Hoffman completed a Physical Capabilities Evaluation form on Plaintiff's behalf. T.556; 569. Dr. Hoffman indicated that Plaintiff was able to work zero hours per day; could never lift any weight; could never push or pull; and could never climb, balance, bend, stoop, kneel, crouch, crawl, reach, handle, grasp, perform overhead lifting, or work on ladders. T.556; 569.

Upon referral by Dr. Huckell, Plaintiff was examined by Dr. David L. Bagnall at Rehab NY Spine & Musculoskeletal Medicine on December 10, 2008. T.570-72. On examination, Plaintiff had limited lumbar flexion (by 50 percent) and extension (by 75 percent). His left leg strength was 4 out of 5 and the right was 5 out of 5. His gait was normal. Slump testing and straight leg raising were positive on the left. Spring testing was negative but there was increased pain at the lumbosacral junction and evidence of lumbar segmental dysfunction. After reviewing Plaintiff's MRI reports, Dr. Bagnall diagnosed "radicular syndrome – lower limb." T.572.

X-rays of Plaintiff's lumbar spine taken on January 19, 2009, were negative. T.579.

On January 21, 2009, Plaintiff saw Dr. Rodes. T.573-74; 601-02. Plaintiff walked with an antalgic gait. His left lower extremity had 0 out of 5 muscle strength, but the right leg had full strength and full range of motion. Plaintiff's mood and affect were normal. Straight leg raising was positive on the right with low back pain and positive on the left with low back, thigh, and leg pain. Plaintiff had limitation and pain with movement of the left lower extremity and full range of motion with discomfort in the right lower extremity. Dr. Rodes opined that Plaintiff was temporarily totally disabled. T.574; 602.

On February 19, 2009, physician's assistant Lynne M. Fries ("P.A. Fries") of Dr. Bagnall's office examined Plaintiff, who complained of back pain. Tr. 577-79; 585-87. PA Fries noted that Plaintiff denied having any anxiety, depression, panic attacks, memory loss or concentration difficulty. T.578. On examination, Plaintiff walked without an assistive device and had a normal gait. Forward and lateral lumbar flexion both were limited by 50 percent; lumbar extension was limited by 75 percent. PA Fries suspected some degree of psychological overlay on Plaintiff's part due to his "poor or exacerbated response to treatment and continued short-term narcotic use and negative diagnostics [sic]". T.579.

On March 7, 2009, Plaintiff was seen by consultative examiner Harbinder Toor, M.D., who examined Plaintiff at the Commissioner's request. T.636-39. Dr. Toor observed that Plaintiff needed no help changing for the examination. T.637. Plaintiff had a normal stance

-12-

but an abnormal gait, and he used a cane prescribed by his doctor. Upon examination, Plaintiff declined to walk on his heels and toes and was unable to stand for more than a few minutes without his cane. Straight leg raising was positive. Muscle strength was full in all extremities with no motor or sensory deficits. Dr. Toor opined that Plaintiff had "moderate to severe" limitations to standing, walking, bending, and heavy lifting due to pain and a balancing problem. T.639. Plaintiff also had a "moderate" limitation to sitting for a "long time", and "mild to moderate" difficulty in pushing, pulling, and reaching due to right shoulder pain. Id.

Also on March 7, 2009, Plaintiff was examined by Thomas Ryan, Ph.D., a consultative examiner. T.632-35. Plaintiff reported no psychiatric hospitalizations. He had gone for counseling two years prior after his estranged father had contacted him. On examination, Plaintiff was dysthymic, but his attention, memory skills, and concentration were intact. His thought processes were coherent and goal directed. Plaintiff cared for his personal needs, did some household chores as well as some cooking and cleaning, socialized, and enjoyed using his computer, fishing and camping. Dr. Ryan concluded that Plaintiff demonstrated no significant limitation in the ability to follow and understand simple directions, perform simple tasks, maintain attention and concentration, maintain a regular schedule, learn new tasks, perform complex tasks, and generally make adequate decisions. T.634. Plaintiff had a moderate

-13-

limitation in the ability at times to deal with others and stress. Id.

Dr. Rodes examined Plaintiff on April 22, 2009. T.696-98. Plaintiff presented with anxiety and depression, in addition to continued aching, sharp and spasming pain in his low back. Straight leg raising was positive bilaterally with low back pain.

M. Totin, a State agency psychologist, reviewed the record on May 21, 2009, and opined that Plaintiff did not have a severe mental impairment. T.648.

On June 18, 2009, Plaintiff saw Dr. Huckell in follow-up, after having gone to the emergency room on June 15, 2009, because of his severe back pain. T.662-66. Plaintiff had an antalgic gait, but was able to stand on his heels and toes showing a fair amount of balance and coordination. Paravertebral spasm was noted. Straight leg raising testing was positive in the supine position at 45 degrees. Dr. Huckell concluded that there was no clear evidence of foraminal compression or lumbar radiculopathy. T.664. He recommended a lumbar CT discogram to assist with making a surgical recommendation. Diagnoses were lumbago, herniated disc (thoracic) without myelopathy, and lumbar spine sprain/strain.

In a report dated June 22, 2009, Dr. Huckell opined that Plaintiff could work in a light duty capacity with the following restrictions: avoid bending, stooping, reaching, twisting, crawling, or climbing; avoid sitting, standing or walking for more than two hours at one time; avoid lifting over 20 pounds; and avoid

a greater than 8-hour workday. T.665. Dr. Huckell added that if a light duty job was not available, Plaintiff would be considered disabled with a temporary total disability from his occupation.

Dr. Melvin Brothman conducted an orthopedic examination of Plaintiff on August 25, 2009, at the request of the Workers' Compensation Board. T.687-91. Plaintiff had no tenderness over the right shoulder and had a negative anterior impingement sign. T.689. Plaintiff had a normal gait and no limp, although he used a cane. Plaintiff's straight leg raising testing was negative while seated and positive while lying down. Dr. Brothman diagnosed questionable disc disease of the thoracic spine, no clinical evidence of lumbar spine disc disease, and possible right shoulder impingement syndrome. Dr. Brothman agreed with Dr. Huckell's suggestion of a discogram and recommended follow-up with Dr. Huckell every 2 to 3 months. With regard to Plaintiff's disability level, Dr. Brothman opined that it was "moderate" and that he was "able to return to partial duty", but he was "to avoid bending, lifting or reaching overhead with his right arm." T.690.

On September 3, 2009, Thomas Lombardo, Jr., M.D. performed an orthopedic examination of Plaintiff at the request of the Workers' Compensation Board. T.700-05. Dr. Lombardo noted weakness in Plaintiff's right biceps, deltoid, and right shoulder; impingement signs were positive. T.704. There was "marked weakness" in Plaintiff's left knee and weakness in his left foot to dorsiflexion and plantar flexion. He was unable to straight-leg-raise "without

-15-

significant pain." T.704. Dr. Lombardo's diagnosis was left knee arthralgia, with a probable torn medial meniscus. T.704. Dr. Lombardo stated that Plaintiff never recovered from his workplace injury in 2005, although he did return to work. Following the January 2008 injury, he has "progressively deteriorated." T.704. Dr. Lombardo agreed "with 25% apportionment" to the 2005 injury and "75% apportionment" to the 2008 injury. Dr. Lombardo recommended steroid injections for, and an MRI of, the left knee. If injections failed to help, a left knee arthroscopy was indicated.

On referral from Dr. Rodes, Plaintiff was examined by pain management specialist Dr. Eugene J. Gosy on December 9, 2009. T.707-10. Straight leg raising was negative bilaterally. Plaintiff had mild spasm at C6 on the left and L5 on the right. Strength was full bilaterally in both the upper and lower extremities. The diagnosis was Low Back Pain (724.2), mechanical pain in the lumbar territory. T.709. Dr. Gosy recommended Zanaflex instead of Soma, and Norco for incidental pain. Dr. Gosy assessed a disability status of 50% and stated that Plaintiff was "able to function in his current light duty position". T.709.

Plaintiff returned to Dr. Gosy on January 13, 2010. T.711-13. Plaintiff reported that he had been working doing maintenance at a school, and walking up the stairs had become "intolerable" due to his continued pain. He had been approved for lumbar facet blocks. He reported that Zanaflex caused dizziness and nausea, and Norco

-16-

provided minimal relief. He was only sleeping approximately 2 to 3 hours per night due to pain. Clinical findings were essentially the same as at the December 9, 2009 appointment. Dr. Gosy diagnosed Low Back Pain (724.2) and Neuralgia, Neuritis & Radiculitis, Unspecified (729.2). T.713. Dr. Gosy again assessed Plaintiff's disability level at 50 percent for Workers' Compensation.

Plaintiff saw Dr. Gosy in follow-up on January 22, 2010. T.714-16. Plaintiff reported that upon awakening, he experiences accelerated pain in the right shoulder and upper arm and swelling of the right elbow, wrist and fingers. The swelling improved during the daytime. Plaintiff currently was taking Norco, Skelaxin, and Vistaril. Clinical findings were essentially the same as at the January 13, 2010 appointment, although tenderness at the anterior right shoulder joint was noted. Diagnoses were Low Back Pain (724.2) and Shoulder Disorders, Other Specified (726.19) (right shoulder arthropathy, rule out rotator cuff injury associated with sympathetically maintained pain. Dr. Gosy ordered an MRI of the right shoulder and prescribed Lidoderm patches for the shoulder.

On April 9, 2010, Plaintiff returned to Dr. Gosy. T.717-19. Clinical findings were the same as the previous appointment. Dr. Gosy added Robaxin and ibuprofen and increased the Lidoderm and Norco dosages. The diagnosis was Lumbago (724.2).

Plaintiff saw Dr. Gosy in follow-up on May 21, 2010. T.720-22. Clinical findings were the same as the previous appointment.

Diagnoses were Lumbago (724.2) and Shoulder Disorders, Other Specified (726.19).

On July 20, 2010, Dr. Gosy administered facet blocks at left L4-L5, and L5-S1 for Plaintiff's facet arthropathy. T.723-24.

On September 9, 2010, Plaintiff saw Dr. Gosy, reporting increased aching, throbbing pain to the low back and aching, nagging pain to the right shoulder area, which referred into the upper arm and forearm. T.725-27. Plaintiff continued to have swelling of his right upper extremity in the mornings. Plaintiff was taking Norco, Robaxin, ibruprofen, and Lidoderm (topical patch). Clinical findings were the same as the previous appointment. Diagnoses were Lumbago (724.2) and Shoulder Disorders, Other Specified (726.19). Dr. Gosy stated that additional lumbar facet injections would be scheduled.

Plaintiff returned to Dr. Gosy on October 6, 2010. T.728-30. Dr. Gosy noted that Plaintiff was under their care for chronic mechanical pain of the lumber territory and chronic right shoulder pain, both of which were status post related injury. Plaintiff complained of low grade aching, throbbing pain in the lower lumbar territory and entire right shoulder area. Plaintiff reported that combination of Norco, Robaxin, ibuprofen, and Lidoderm patches had been "minimally beneficial" but "well tolerated." T.728. Norco was discontinued and Percocet added. Diagnosis was Lumbago (724.2). Disability status remained the same as the previous appointment.

Plaintiff underwent an MRI of his right shoulder on November 3, 2010, at Dr. Gosy's request. T.731. Imaging revealed mild acromioclavicular arthropathy, mild supraspinatus impingement due to a type III anteriorly hooked acromion, a significant amount of supraspinatus tendinopathy without tear, and a tear of the anterior glenoid labrum. There was a possible accessory ossicle at the inferior margin of the glenohumeral joint, which also could represent a Bankart lesion or Bankart fracture; correlation with x-rays was recommended. T.731.

On December 23, 2010, Plaintiff returned to see Dr. Gosy for his lower back and right shoulder pain. T.764-66. His reports of pain were consistent with previous appointments. Plaintiff appeared to be "in moderate distress and pain is indicated by groaning." T.766. There was tenderness at the lumbosacral junction, and the anterior shoulder joint was tender, with abduction limited at 90 degrees. Straight leg raising was negative.  Diagnoses were Lumbago (724.2) and Shoulder Disorders (726.19).

Dr. Gosy completed a Medical Source Statement Of Ability To Do Work-Related Activities (Physical) at the Commissioner's request on December 24, 2010. T.733-38. With regard to "Lifting/Carrying", Dr. Gosy indicated that Plaintiff "never" could lift up to 10 pounds and "never" could carry up to 10 pounds. Plaintiff could sit, stand, or walk for 30 to 45 minutes at a time without interruption; and he could sit, stand, or walk for 2 hours each (for a total of 6 hours of activity) in an 8-hour workday. Dr. Gosy

-19-

precluded Plaintiff from any reaching, handling, fingering, feeling, and pushing/pulling with his right hand, and opined that he "occasionally" could perform these activities with his left hand. Plaintiff "occasionally" could operate foot controls with his right foot and left foot. Plaintiff "never" could climb stairs, ramps, ladders, or scaffolds; stoop; kneel; crouch; or crawl. He "occasionally" could balance. Dr. Gosy assessed the most restrictive environmental limitations (e.g., no working at unprotected heights or in extreme cold), except that Plaintiff could "occasionally" operate a motor vehicle.

## B. Vocational Expert Testimony

Vocational expert Josephina "Joey" Kilpatrick ("the VE") testified telephonically at the hearing. After listening to Plaintiff's testimony, she classified his past work (i.e., hairstylist, janitor, forklift operator, painter, and packer and material handler) as "light" to "very heavy" in exertional level, as Plaintiff actually performed those jobs. T.52-53. The ALJ asked the VE expert to assume a hypothetical individual of the same age, education, and work experience as Plaintiff, who is able to perform light work as defined in the regulations, who would require a sit-stand option that would be performed at the work station so the person would not be off-task or leave the work area, and who can sit or stand at will. T.53. In addition, the individual never would be able to use his left lower extremity to operate foot controls, should never climb ladders or scaffolds, should only occasionally

climb ramps and stairs, and should only occasionally stoop, kneel, crouch, and crawl. The individual would be precluded from overhead reaching with the right upper extremity, and should avoid concentrated use of heavy moving machinery and concentrated exposure to unprotected heights. The individual would be able to understand, remember, and carry out simple instructions, make judgments on simple work-related decisions, interact appropriately with supervisors and co-workers in routine work settings, and respond to usual work situations and changes in routine work settings. Upon being asked whether such an individual would be able to perform any of Plaintiff's past work, the VE testified in the negative. However, such an individual could perform the following representative jobs: photocopy machine operator (light exertional level), Dictionary of Occupational Titles ("DOT") Code No. 207.685-014, of which there are 31,000 of these jobs nationally and 2,000 in New York State; ticket seller (light), DOT Code No. 211.467- 030, of which there are 3.5 million jobs in the national economy and 100,000 in New York State; and information clerk (light), DOT 237.367-018 of which there are 1.1 million jobs nationally and 29,000 in the State. T.54.

Upon questioning by Plaintiff's representative, the VE testified that the DOT does not include a "sit/stand option"; rather, the above data regarding jobs and job numbers came from United States Census Bureau information. T.55. The VE stated that her opinion about whether a job includes a "sit/stand option" was

based on an occupational analysis of jobs in the open labor market. The VE testified that a person with the limitations specified in Dr. Gosy's December 2010 Medical Source Statement would not be able to perform any jobs in the national economy. T.57-61.

## IV.   Discussion of Plaintiffs' Contentions

### A.   Erroneous Step Two Finding

Plaintiff contends that ALJ Pang's step two analysis was incomplete because he failed to find that Plaintiff's shoulder and knee impairments were "severe" impairments, in addition to his degenerative disc disease, anxiety, and depression. At this step, the Commissioner must determine whether a claimant has a "severe" impairment, defined as "any impairment or combination of impairments which significantly limits physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(a)(4)(ii), (c). "Basic work activities" is defined to "mean the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b). An impairment is "not severe" where the "medical evidence establishes only a slight abnormality or combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work, even if the individual's age, education, or work experience were specifically considered[.]" Social Security Ruling ("SSR") 85-28, 1985 WL 56856, at *3 (S.S.A. 1985); see also SSR 96-3p, 1996 WL 374181, at *1 (S.S.A. July 2, 1996). The Second Circuit has made clear that the "severity" standard is applied "solely to screen out de minimis claims." Dixon v. Shalala, 54 F.3d

-22-

1019, 1030 (2d Cir. 1995); see also SSR 85-28, 1985 WL 58656, at *4 ("Great care should be exercised in applying the not severe impairment concept.").

Plaintiff argues that the ALJ erred in failing to find that his right shoulder impairment was "severe" for purposes of step two. The Court agrees. There is ample objective medical evidence in the record demonstrating that Plaintiff's right shoulder condition significantly limits his ability to perform basic work activities. For instance, in September 2009, IME Dr. Lombardo examined Plaintiff and found that he had weakness in his biceps and deltoid in the right shoulder[;] [i]mpingement signs are positive." T.704. A November 2010 MRI of Plaintiff's right shoulder showed, inter alia, mild supraspinatus impingement due to a type III anteriorly hooked acromion, a significant amount of supraspinatus tendinopathy, and a tear of the anterior glenoid labrum.

Likewise, the Court agrees that the ALJ erroneously failed to consider Plaintiff's left knee condition to be a "severe" impairment since, again, there is objective medical evidence indicating that this condition significantly limits his ability to perform basic work activities. For example, Dr. Bergfeld diagnosed Plaintiff as having a possible meniscal tear in his left knee. IME Dr. Lombardo noted that Plaintiff had "marked weakness" in his left knee, with an "inability to straight leg raise without significant

pain." Dr. Lombardo diagnosed left knee arthralgia and a probable torn left medial meniscus.

## B.    Erroneous Step Three Analysis

Plaintiff argues that the ALJ erred at the third step of the five-step inquiry, in which the ALJ was required to determine whether his impairment or combination of impairments matches any of those in the Listing of Impairments, 20 C.F.R. § 404.1525(a); 20 C.F.R. Pt. 404, Subpt. P, App. 1. The burden is on Plaintiff, as the party claiming disability, to demonstrate that his impairment (or combination of impairments) meets or is equal in severity to a listed impairment based on medical evidence. Sullivan v. Zebley, 493 U.S. 521, 530 (1990). Plaintiff meets this burden by showing that he meets all of the specified criteria for the impairment set forth in the Listing. Id.; see also SSR 83-19, 1983 WL 31248, at *2 (S.S.A. 1983) ("An impairment 'meets' a listed condition in the Listing of Impairments only when it manifests the specific findings described in the set of medical criteria for that listed impairment.").

The ALJ found that Plaintiff's degenerative disc disease does not meet any listed impairment because "the record does not reflect the degree of motor or neurological deficits as required by any listing found under 1.00 Musculoskeletal (including 1.04 [Disorders of the spine])[.]" T.89. The ALJ next concluded, "[N]or does the evidence show that the claimant is unable to effectively ambulate or perform fine and gross movements effectively as defined by

-24-

1.00B2b or 1.00B2c (as referenced in 1.02 [Major dysfunction of a joint])." Id.

The Court agrees with Plaintiff that the ALJ's step three analysis is legally erroneous inasmuch as it provides no record support or rationale for how he reached his findings as to listing equivalency. With regard to Listing 1.04, the ALJ did not analyze, much less mention, any of the relevant medical evidence regarding Plaintiff's diagnoses involving his degenerative disc disease and lower lumbar pain, or the symptoms and deficits caused thereby. The ALJ's "one-sentence, conclusory analysis [of the pertinent listed impairment] without any recitation of the facts or medical evidence[,]" Hamedallah ex rel. E.B. v. Astrue, 876 F. Supp.2d 133, 144 (N.D.N.Y. 2012), is "plain error." Id. (citing Morgan o/b/o Morgan v. Chater, 913 F. Supp. 184, 188-89 (N.D.N.Y. 1996)).

Furthermore, the ALJ's error at step two necessarily affected his step three analysis: "[B]ecause the ALJ must consider the combined impact of the impairments specifically identified at step two throughout the remainder of the five evaluative steps, 20 C.F.R. § 404.1523, the ALJ's lack of specificity at step two in this case necessarily forecloses effective review of his analysis at step three." McClaney v. Astrue, No. 10-CV-5421(JG)(JO), 2012 WL 3777413, at *8 (E.D.N.Y. Aug. 10, 2102). At step two, the ALJ did not find Plaintiff's right shoulder impairment and left knee impairment to be "severe", yet he specifically considered Listing 1.02(A) and Listing 1.02(B) at step three. This is incongruous,

-25-

since Listing 1.02(A) and Listing 1.02(B) cover "major joint dysfunctions due to any cause" and potentially could apply to his knee and shoulder conditions. Indeed, the fact that the ALJ analyzed Listings 1.02(A) and (B) undermines his step two finding that Plaintiff's shoulder and knee impairments were <u>not</u> severe.

### C. **Erroneous Application of the Treating Physician Rule**

Plaintiff argues that the ALJ erred by failing to address, in any manner, the December 24, 2010 opinion of pain treatment specialist Dr. Gosy, of one of Plaintiff's treating physicians.

The opinion of a claimant's treating physician should be given controlling weight over other medical opinions in the record if it is "well supported by medical findings and not inconsistent with other substantial evidence." <u>Rosa v. Callahan</u>, 168 F.3d 72, 78–79 (2d Cir. 1999) (citing <u>Clark v. Commissioner of Soc. Sec.</u>, 143 F.3d 115, 118 (2d Cir. 1998) (citing 20 C.F.R. § 404.1527(d)(2); other citation omitted). Even if the treating physician's opinion is contradicted by substantial evidence in the record, and not found to be controlling, it still is entitled "some extra weight, because the treating source is inherently more familiar with a claimant's medical condition than are other sources." <u>Schisler v. Bowen</u>, 851 F.3d 43, 47 (2d Cir. 1988). In evaluating a report offered by a claimant's treating physician, "the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion." <u>Rosa</u>, 168 F.3d at 78–79 (quotation and citations omitted). Where a treating physician's opinion on the nature and severity of a

claimant's disability is not afforded "controlling" weight, the ALJ must "comprehensively set forth [his] reasons for the weight assigned to a treating physician's opinion." Burgess v. Astrue, 537 F.3d 117, 129 (2d Cir. 2008) (quotation and citation omitted; alteration in original). In particular, the regulations direct the ALJ to assess the weight to be given by reference to "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant factors." Schaal, 134 F.3d at 503 (citing 20 C.F.R. § 416.927(d)(2)).

Here, Dr. Gosy undoubtedly qualifies as one of Plaintiff's "treating physicians", having seen Plaintiff regularly over the course of a year to address Plaintiff's chronic pain complaints due to his severe impairments in his lower back and right shoulder. See Arnone v. Bowen, 882 F.2d 34, 41 (2d Cir. 1989) ("Whether the 'treating physician' rule is appropriately applied depends on 'the nature of the ongoing physician-treatment relationship.") (quoting Schisler v. Heckler, 851 F.2d 43, 45 (2d Cir. 1988)). The record reflects that Plaintiff was referred to Dr. Gosy in December 2009, for pain management concerns stemming from the injuries Plaintiff sustained during his January 17, 2008 injury at work. Dr. Gosy issued his Medical Source Statement on December 24, 2010. During this one-year period, Plaintiff saw Dr. Gosy regularly and with

-27-

some frequency. Dr. Gosy was a specialist in the area of pain management and was primarily responsible for coordinating Plaintiff's pain medication regimen. He also ordered diagnostic testing such as MRIs, and performed facet blocks.

Given that the ALJ did not even mention, much less discuss, Dr. Gosy's Medical Source Statement, the ALJ evidently did not give "controlling" weight to it. Furthermore, there is no indication as to what weight—if any—the ALJ did assign to that opinion. This constitutes legal error. See, e.g., Kentile v. Colvin, No. 8:13-CV-880(MAD/CFH), 2014 WL 3534905, at *15 (N.D.N.Y. July 17, 2014) (finding reversible error where the ALJ "neglected to assign any weight to the [treating] doctor's opinions/diagnosis and failed to explain why he disregarded the opinions entirely"); Ligon v. Astrue, No. 08-CV-1551(JG)(MDG), 2008 WL 5378374, at *12 (E.D.N.Y. Dec. 23, 2008) ("[T]he ALJ utterly failed to perform the required task of determining what weight [the treating source opinion] deserved. . . . Here the ALJ failed, for example, to take into account that Hedrych is a trauma specialist, or to consider the frequency of his examinations of Ligon and the length, nature and extent of Ligon's treatment relationship with Hedrych.").

### D. Erroneous Credibility Assessment

Under the regulations, an ALJ first must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms he alleges, and if so, the ALJ then must consider the extent to which the

claimant's symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence of record. See 20 C.F.R. § 404.1529(a), (c). An "ALJ's decision to discount a claimant's subjective complaints of pain" will be upheld only when that decision is "supported by substantial evidence." Aponte v. Secretary Dept. of Health & Human Servs., 728 F.2d 588, 591 (2d Cir. 1984); see also Brandon v. Bowen, 666 F. Supp. 604, 608 (S.D.N.Y. 1987) ("If the ALJ decides to reject subjective testimony concerning pain and other symptoms, he must do . . . with sufficient specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief and whether his determination is supported by substantial evidence.") (citations omitted).

Here, the ALJ identified the correct legal standard for assessing credibility but failed to apply it, concluding summarily that Plaintiff's statements concerning the intensity, persistence and limiting effects of his symptoms were "not credible to the extent they are inconsistent with the above residual functional capacity assessment." It is erroneous for an ALJ to find a claimant's statements not fully credible because those statements are inconsistent with the ALJ's own RFC finding. E.g., e.g., Burton v. Colvin, No. 6:12-CV-6347 (MAT), 2014 WL 2452952, at *10 (W.D.N.Y. June 2, 2014) (citing Smollins v. Astrue, No. 11-CV-424, 2011 WL 3857123, at *11 (E.D.N.Y. Sept. 1, 2011); Mantovani v. Astrue, No. 09-CV-3957, 2011 WL 1304148, at *5 (E.D.N.Y. Mar. 31,

2011); see also Pepper v. Colvin, 712 F.3d 351, 367-68 (7th Cir. 2013) (criticizing such language as "meaningless boilerplate"). Because the assessment of a claimant's ability to work will often depend on the credibility of his subjective complaints, it is illogical to decide a claimant's RFC prior to assessing his credibility. Otero v. Colvin, 12-CV-4757, 2013 WL 1148769, at *7 (E.D.N.Y. Mar. 19, 2013); see also Molina v. Colvin, No. 13 Civ. 4989(AJP), 2014 WL 3445335, at *14 (S.D.N.Y. July 15, 2014). Using that RFC to discredit the claimant's subjective complaints then merely compounds the error. Otero, 2013 WL 1148769, at *7.

The ALJ also chose to discredit Plaintiff's subjective complaints, in part, based on his lay opinion that "a majority of the claimant's MRI's and x-rays were normal." This constitutes legal error. See, e.g., Singletary v. Apfel, 981 F. Supp 802, 807 (W.D.N.Y. 1997). Furthermore, it is a conclusion that is contradicted by objective medical evidence. See T.501, 507-09, 510-11, 731.

In addition, the ALJ relied on an isolated portion of the record to support his belief that Plaintiff was "overexaggerating his symptoms". Specifically, the ALJ focused on a single comment by a physician's assistant (not an acceptable medical source) that she "suspect[ed] some degree of psychosocial overlay" with regard to the degree and nature of Plaintiff's pain complaints. The ALJ ignored the fact that none of Plaintiff's treating doctors have suggested that Plaintiff has been magnifying or exaggerating his

symptoms. This type of selective cherry-picking of the record is improper. See, e.g., Meadors v. Astrue, 370 F. App'x 179, 185, 2010 WL 1048824, at *4, n. 2 (2d Cir. Mar. 23, 2010) (citation omitted); Royal v. Astrue, No. 5:11-CV-456(GTS/ESH), 2012 WL 5449610, at *6 (N.D.N.Y. Oct. 2, 2012) (while ALJs are entitled to resolve conflicts in the record, they cannot pick and choose only evidence from the same sources that supports a particular conclusion) (citation omitted).

### E. Erroneous RFC Assessment

The ALJ's RFC assessment in this case necessarily was affected by and indeed, based in part upon, his determinations at step two with regard to which of Plaintiff's impairments were severe, his determinations at step three regarding listing equivalency, his assessment of treating source opinions, and his evaluation of Plaintiff's credibility. As the Court has found that remand is appropriate as to all of these issues, reconsideration of the RFC will be necessary.

### F. Errors In Connection With the VE's Testimony

At step five, the burden is on the Commissioner to prove that "there is other gainful work in the national economy which the claimant could perform." Balsamo v. Chater, 142 F.3d 75 (2d Cir. 1998). A VE's opinion in response to an incomplete hypothetical question cannot provide substantial evidence to support a denial of disability. See DeLeon v. Secretary of Health and Human Servs., 734 F.2d 930, 936 (2d Cir. 1984). In light of the errors that occurred

-31-

earlier in the sequential evaluation, discussed above, it is likely that the RFC assessment will have to be re-formulated. If that is the case, the hypotheticals posed to the VE also will be affected.

Plaintiff also asserts a procedural error, namely, that the VE's testimony should be stricken because he did not receive notice that the VE would be testifying telephonically rather than via videoconference. As Plaintiff explains, the notice of the videoconference hearing stated that the VE also would appear by videoconference. At the hearing, however, the VE testified via telephone. The Commissioner has misapprehended Plaintiff's argument and therefore did not address it.

Although the Second Circuit has not ruled on this precise issue, Plaintiff's contention has found strong support from the district courts in this Circuit and elsewhere. E.g., Koutrakos v. Astrue, 906 F. Supp.2d 30, 34 (D. Conn. 2012) (ALJ committed error of law that was not harmless in disregarding then-current regulations and receiving and considering telephonic testimony from vocational expert over timely objection by claimant's counsel); Edwards v. Astrue, 3:10-cv-1017, 2011 WL 3490024, at *7 (D. Conn. Aug. 10, 2011) (collecting cases). The Court agrees with these cases that the ALJ's receipt of telephonic testimony from the VE was in violation of the SSA regulation in effect at the time of Plaintiff's 2011 hearing. See id.; see also Decker v. Commissioner of Soc. Sec., No. 2:12-CV-00454, 2013 WL 4830961, at *5-6 (S.D. Ohio Sept. 10, 2013). The Court notes that Plaintiff's non-attorney

representative did not object to the appearance of the VE by telephone, although he did object to her methodology and conclusions. However, since the Court already is remanding for a new hearing, it is unnecessary to determine whether this claim of procedural error was preserved and, if so, was sufficiently harmful to warrant remand.

## V.   Remedy

"Sentence four of Section 405(g) provides district courts with the authority to affirm, reverse, or modify a decision of the Commissioner 'with or without remanding the case for a rehearing.'" Butts v. Barnhart, 388 F.3d 377, 385 (2d Cir. 2002) (quoting 42 U.S.C. § 405(g)). Here, the ALJ has misapplied the relevant legal standards, making further administrative proceedings before the Commissioner necessary. Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996) (citation omitted). Although Plaintiff argues that a remand solely for the calculation of benefits is merited, the Court finds that remand is the more appropriate remedy, as "further findings or a clearer explanation for the decision" would help to assure the proper disposition of Plaintiff's claim.  Id. (citation omitted). The Court is aware of the delays that regrettably have occurred in this case; however, delay alone is not a proper basis for remand solely for calculation of benefits. Bush v. Shalala, 94 F.3d 40, 46 (2d Cir. 1996) (citation omitted).

In addition, Plaintiff has requested a remand pursuant to sentence six of Section 405(g)[2] to consider additional medical evidence that was not before the ALJ in 2011. Since the Court is granting a sentence four remand, the request for a sentence six remand is moot. However, the new medical evidence may be relevant and material to the disability claim at issue here, even though the records post-date the ALJ's decision. See, e.g., Pollard v. Halter, 377 F.3d 183, 193 (2d Cir. 2004) (finding that medical evidence generated after the ALJ rendered his decision is not irrelevant solely based on timing; subsequent evidence of a claimant's condition may demonstrate that, during the relevant time period, the condition "was far more serious than previously thought").

As noted above, Plaintiff has filed a new DIB claim alleging an onset date of July 23, 2011, the day after ALJ Pang's decision. This claim is still in administrative proceedings. It does not appear that ALJ Moskal treated Plaintiff's second DIB claim as an implied request to reopen the first DIB proceeding. Likewise, it does not appear that the Commissioner has reopened Plaintiff's first DIB claim. Accordingly, unless the Commissioner elects to consolidate the second DIB claim with the DIB claim at issue here, this Court's remand covers the period from January 17, 2008, the

---

[2]

In contrast to a remand under sentence four, a sentence six remand does not involve the district court making a judgment as to the correctness of the Commissioner's decision. Melkonyan v. Sullivan, 111 S. Ct. 2157, 2163 (1991). In addition, the district court retains jurisdiction over the case following a sentence six remand. Id.; see also Correa v. Sullivan, No. 92 Civ. 0408(LLS), 1992 WL 367116, at *2 (S.D.N.Y. Nov. 24, 1992).

alleged onset date in the first DIB claim, to the date of ALJ Pang's decision regarding that claim on July 22, 2011.

**VI.   Conclusion**

For the foregoing reasons, the decision of the Commissioner is reversed, the Commissioner's motion for judgment on the pleadings is denied, and Plaintiff's motion for judgment on the pleadings is granted to the extent that this case is remanded to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings consistent with this Decision and Order. Plaintiff's motion for remand pursuant to sentence six is denied as moot. The Clerk of the Court is directed to close this case.

**SO ORDERED.**

S/Michael A. Telesca

_____

HONORABLE MICHAEL A. TELESCA
United States District Judge

DATED:    December 18, 2014
          Rochester, New York

-35-